UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


BRIAN PETERSON #477079,

          Petitioner,                           Hon. Janet T. Neff

v.                                             Case No. 1:16-CV-1014

SHERMAN CAMPBELL,

          Respondent.

_____/


## REPORT AND RECOMMENDATION

       This matter is before the Court on Peterson's petition for writ of habeas corpus.   In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Peterson's petition be **denied**.

## BACKGROUND

       As a result of events occurring on October 21, 2012, Petitioner was charged with open murder.   (Trial Transcript, July 9, 2013, at PageID.325).   Several people testified at Petitioner's jury trial.   The relevant portions of their testimony are summarized below.

**Brian Veltman**

       As of October 21, 2012, Veltman was employed as a Public Safety Officer for the City of Kalamazoo.   (Trial Transcript, July 10, 2013, at PageID.563-64).   At approximately 3:23 a.m. that morning, Veltman was dispatched to 714 West Cedar to investigate a reported assault. (Trial Transcript, July 10, 2013, at PageID.564-65).   Upon arriving at the scene, Officer Veltman

1

was met outside the residence by Petitioner and a female.  (Trial Transcript, July 10, 2013, at PageID.565-67).  Petitioner stated to Veltman, "Hurry up, there's a lot of blood."  (Trial Transcript, July 10, 2013, at PageID.567).

Upon entering the residence, Officer Veltman observed Luke Vincent "laying on the ground face up" with "towels all around his head that were soaked in blood."  (Trial Transcript, July 10, 2013, at PageID.568).  Christiana Rohall was "leaning over" Vincent crying and rocking back and forth.  (Trial Transcript, July 10, 2013, at PageID.568, 579).  When Veltman asked Rohall, "what happened," she stated that Vincent "picked up the TV and dropped it on his own head."  (Trial Transcript, July 10, 2013, at PageID.568, 581).  This response "didn't make a ton of sense" to Veltman because the television "was sitting on a TV stand, but the TV stand was only maybe about a foot off the ground."  (Trial Transcript, July 10, 2013, at PageID.568-69).  Veltman also observed two "dumbbells" lying near Vincent's body.  (Trial Transcript, July 10, 2013, at PageID.574, 582-84).

Officer Veltman observed that Vincent had been struck "behind his right ear."  (Trial Transcript, July 10, 2013, at PageID.571).  When Veltman initially arrived on the scene, Vincent "had a good pulse and was still breathing," but his pulse "slowly got worse" and his "breathing got more shallow."  (Trial Transcript, July 10, 2013, at PageID.571).  Eventually, Vincent stopped breathing and went into cardiac arrest at which point Veltman began performing CPR.  (Trial Transcript, July 10, 2013, at PageID.571-73).  Resuscitation efforts were unsuccessful and Vincent was soon thereafter pronounced dead.  (Trial Transcript, July 10, 2013, at PageID.573-75).

Officer Veltman was subsequently informed that Petitioner was "a likely suspect" in Vincent's killing.  (Trial Transcript, July 10, 2013, at PageID.575-76).  Petitioner agreed to

"talk to the detectives and give a statement" at which point Veltman transported Petitioner to the Kalamazoo Department of Public Safety Headquarters.  (Trial Transcript, July 10, 2013, at PageID.576-77).  Officer Veltman did not observe on Petitioner any cuts, abrasions, scratches, bumps, or bruises.  (Trial Transcript, July 10, 2013, at PageID.581-82).  Veltman did observe that Christiana Rohall appeared to have a "bump" on the right side of her forehead.  (Trial Transcript, July 10, 2013, at PageID.582).

**Scott Miller**

As of October 21, 2012, Miller was employed as a Sergeant with the Kalamazoo Department of Public Safety.  (Trial Transcript, July 10, 2013, at PageID.587).  At approximately 3:23 a.m. that morning, Miller was dispatched to 714 West Cedar to investigate a reported "altercation between a male and female."  (Trial Transcript, July 10, 2013, at PageID.587-88).

Upon entering the residence, Miller observed Officer Veltman providing first aid to Luke Vincent.  (Trial Transcript, July 10, 2013, at PageID.589).  Miller then had a brief conversation with Christiana Rohall, who stated that she and Vincent "were in an argument, and that he got mad and picked up a TV, and it landed on his head."  (Trial Transcript, July 10, 2013, at PageID.589-91).  This explanation, however, did not "make sense" to Sergeant Miller because:

> Where the body was at and where the TV was located, there was approximately five feet dis – difference and the TV was lying facedown with the screen facing the ground, and it was basically just off of where the TV stand was, and I observed cords and stuff still plugged in.  So it wasn't making sense how he picked up the TV and was able to move from where he was to where the TV was at.

(Trial Transcript, July 10, 2013, at PageID.591-92).

When Rohall was asked "how [Vincent] had picked [the TV] up," she responded, "I don't know."  (Trial Transcript, July 10, 2013, at PageID.601).  Sergeant Miller asked Rohall

if Vincent's body had been moved, to which Rohall responded that "the body's never been moved." (Trial Transcript, July 10, 2013, at PageID.592). Miller tried to question Rohall further, but Rohall appeared "confused." (Trial Transcript, July 10, 2013, at PageID.592). Miller believed that Rohall "knew more than she was telling" him. (Trial Transcript, July 10, 2013, at PageID.598). Miller did not observe any injuries to Rohall. (Trial Transcript, July 10, 2013, at PageID.598).

After Vincent was declared dead, Miller helped secure the residence so that evidence could be secured and a search conducted. (Trial Transcript, July 10, 2013, at PageID.595-96). Miller did not have any contact with Petitioner. (Trial Transcript, July 10, 2013, at PageID.598).

**David Juday**

As of October 21, 2012, Juday was employed as an officer with the Kalamazoo Department of Public Safety. (Trial Transcript, July 10, 2013, at PageID.606). At approximately 3:20 a.m. that morning, Juday was dispatched to 714 West Cedar to assist other officers investigate an assault. (Trial Transcript, July 10, 2013, at PageID.606-07). Upon his arrival at this location, Juday encountered Audrie Brown who was "visibly upset, crying, shaking." (Trial Transcript, July 10, 2013, at PageID.607-08).

When Juday entered the residence, he observed Officer Veltman and Sergeant Miller providing first aid to Luke Vincent. (Trial Transcript, July 10, 2013, at PageID.609). Sergeant Miller instructed Juday to conduct a protective sweep of the residence and then speak with the other individuals in the residence. (Trial Transcript, July 10, 2013, at PageID.609). When Juday entered the kitchen he encountered Christiana Rohall who was "extremely intoxicated and was crying and very upset." (Trial Transcript, July 10, 2013, at PageID.611). Rohall was

"slurring her speech" and was having difficulty standing.  (Trial Transcript, July 10, 2013, at PageID.611-12).  Juday instructed Rohall to sit down so that he could continue searching the residence.    (Trial Transcript, July 10, 2013, at PageID.611-12).    Juday subsequently encountered Petitioner and Lindsey West in a bedroom in the rear portion of the residence.  (Trial Transcript, July 10, 2013, at PageID.614-15).  Petitioner indicated that he lived in the residence and that this was his bedroom.  (Trial Transcript, July 10, 2013, at PageID.618).  West indicated that she "stayed there on the weekends" with Petitioner.  (Trial Transcript, July 10, 2013, at PageID.618).  Juday instructed the pair to walk to the kitchen so that he could "keep an eye on all of 'em" while officers attempted to determine what had occurred.  (Trial Transcript, July 10, 2013, at PageID.615-16).

Petitioner stated that "there was an argument that was taking place between Miss Rohall and Mr. Vincent, and that there was a commotion and then that the TV either fell on him or he fell on top of the TV."  (Trial Transcript, July 10, 2013, at PageID.619).  Petitioner also stated that "when he walked into the kitchen he saw Mr. Vincent laying there on the floor."  (Trial Transcript, July 10, 2013, at PageID.649).  Petitioner was "very calm," but West was "shaking uncontrollably."  (Trial Transcript, July 10, 2013, at PageID.619).  Based on West's facial expression, Juday concluded that "there was something else that was going on."  (Trial Transcript, July 10, 2013, at PageID.619-21).  After additional police officers arrived, Petitioner exited the residence at which point Officer Juday asked West if she would like to speak with him privately."  (Trial Transcript, July 10, 2013, at PageID.620-21).  West agreed and the pair entered a bedroom.  (Trial Transcript, July 10, 2013, at PageID.621).

Juday stated to West, "look, there is something more that is going on that's not being said."  (Trial Transcript, July 10, 2013, at PageID.621).  Based on West's subsequent

5

comments, Juday exited the bedroom to search for a dumbbell.    (Trial Transcript, July 10, 2013, at PageID.621-24).    Juday observed a dumbbell laying near Vincent's body.    (Trial Transcript, July 10, 2013, at PageID.624).    When Juday concluded his interview, West asked "if she could leave the house [be]cause she did not feel comfortable being there anymore."    (Trial Transcript, July 10, 2013, at PageID.628).    West agreed to speak with detectives at the Kalamazoo Department of Public Safety Headquarters at which point she was escorted from the residence. (Trial Transcript, July 10, 2013, at PageID.629-30).

After West departed with Detectives Kristin Cole and Chuck Dahlinger, Officer Juday approached Audrie Brown.    (Trial Transcript, July 10, 2013, at PageID.631).    Juday spoke with Brown, after which Brown was permitted to gather her belongings and depart.    (Trial Transcript, July 10, 2013, at PageID.631-33).

**Kristin Cole**

As of October 21, 2012, Cole was employed as a Detective for the Kalamazoo Department of Public Safety.    (Trial Transcript, July 10, 2013, at PageID.658-59).    Early that morning, Cole was dispatched to 714 West Cedar to investigate a circumstance in which an individual "either had a TV fall[] on his head or had been struck in the head with the TV."    (Trial Transcript, July 10, 2013, at PageID.659-60).    Upon arriving at the residence, Cole and her partner began "separating people and interviewing people."    (Trial Transcript, July 10, 2013, at PageID.660-61).

Cole first spoke with Christiana Rohall, Luke Vincent's girlfriend.    (Trial Transcript, July 10, 2013, at PageID.662).    Rohall was "very emotional, very upset" and also "very intoxicated."    (Trial Transcript, July 10, 2013, at PageID.662).    Rohall's "speech was slurred" and "she had difficulty focusing on [Cole's] questions."    (Trial Transcript, July 10, 2013,

at PageID.662).    Cole observed that Rohall "had [a] little bit of blood on the bridge of her nose and some swelling to her forehead."  (Trial Transcript, July 10, 2013, at PageID.664).    Rohall indicated that Vincent had not struck her, but that she had instead "tripped."  (Trial Transcript, July 10, 2013, at PageID.664).    Rohall did not know what happened to Vincent.    (Trial Transcript, July 10, 2013, at PageID.665).    Rohall speculated that "the TV had fallen on [Vincent]" or that "he had pulled to TV onto himself," but she was unsure because "she had her back turned."    (Trial Transcript, July 10, 2013, at PageID.665).    Rohall further stated that she and Vincent had been arguing and then "she heard a loud thump and when she looked, [Vincent] was down and the TV was down."    (Trial Transcript, July 10, 2013, at PageID.665-66).    Rohall told Cole that when this occurred, she thought Petitioner was in his bedroom, but that she really did not know.    (Trial Transcript, July 10, 2013, at PageID.673).    Rohall also indicated that when Vincent "gets angry, he hits things or destroys things."    (Trial Transcript, July 10, 2013, at PageID.666).

Detective Cole then spoke with Lindsey West.    (Trial Transcript, July 10, 2013, at PageID.666-67).    West was "visibly shaking" and appeared "absolutely terrified."    (Trial Transcript, July 10, 2013, at PageID.667).    West agreed to speak with the detectives at headquarters and then stated, "I don't want to ever come back here."    (Trial Transcript, July 10, 2013, at PageID.667).

**Dr. Michael Markey**

On October 22, 2012, Dr. Markey performed an autopsy on Luke Vincent.    (Trial Transcript, July 10, 2013, at PageID.685-87).    The autopsy revealed that Vincent had been struck in the head in "at least three different locations" causing fractures that "went through the full thickness of the – of the – of the bone" of the skull.    (Trial Transcript, July 10, 2013, at

PageID.698-702).   While Dr. Markey could not identify with certainty the object used to strike Vincent, he indicated that "to get a depressed skull fracture like {Vincent suffered], it usually requires a significant amount of force and typically with a relatively small surface area."   (Trial Transcript, July 10, 2013, at PageID.704).   Vincent's blood alcohol level was determined to be 0.190 which is "two to two-and-a-half times what would be considered legally drunk if you were driving a vehicle."   (Trial Transcript, July 10, 2013, at PageID.706-07).

**Lindsey West**

West met Petitioner in August 2012 and the two began dating.   (Trial Transcript, July 10, 2013, at PageID.744-45).   Shortly thereafter, West began spending several nights a week with Petitioner.   (Trial Transcript, July 10, 2013, at PageID.745-46).   During this time, West observed that Christiana Rohall and Luke Vincent "would get in arguments" during which Vincent would "punch holes in the wall, [and] break dishes."   (Trial Transcript, July 10, 2013, at PageID.747-48).   These arguments also involved yelling and profanity, but West never observed Vincent or Rohall physically strike the other.   (Trial Transcript, July 10, 2013, at PageID.748-49).   West told Petitioner that she "didn't really feel comfortable sleeping there if they were gonna fight all night."   (Trial Transcript, July 10, 2013, at PageID.749).   Petitioner responded that Rohall and Vincent fighting "was really like a common occurrence."   (Trial Transcript, July 10, 2013, at PageID.749).   On at least two occasions, West and Petitioner left the residence because of the disruption and stayed in a hotel.   (Trial Transcript, July 10, 2013, at PageID.750).

On October 21, 2012, Petitioner went to West's place of employment and began drinking beer.   (Trial Transcript, July 10, 2013, at PageID.751).   The pair exited "a little after 2:00" a.m. and returned to Petitioner's residence.   (Trial Transcript, July 10, 2013, at PageID.751-52).   The pair arrived just as Rohall and Vincent were returning home.   (Trial Transcript, July

8

10, 2013, at PageID.752).   Rohall and Vincent "were drunk" and "were bickering and stuff on the way to the house."   (Trial Transcript, July 10, 2013, at PageID.752).   West and Petitioner entered the residence and went to Petitioner's bedroom where they heard Rohall and Vincent begin fighting.   (Trial Transcript, July 10, 2013, at PageID.753).   Vincent accused Rohall of "fucking all his friends."   (Trial Transcript, July 10, 2013, at PageID.753-54).

Vincent eventually went upstairs and began "breaking things."   (Trial Transcript, July 10, 2013, at PageID.756).   At this point, West, feeling "really uncomfortable," determined to "call the police."   (Trial Transcript, July 10, 2013, at PageID.756).   An "instant" later, Vincent returned downstairs, yelled "you f-ing cunt" at Rohall, and then "hit her."   (Trial Transcript, July 10, 2013, at PageID.756).   Rohall yelled, "Luke, why'd you hit me"? and then began crying "hysterically."   (Trial Transcript, July 10, 2013, at PageID.756).

Petitioner responded to these events by picking up a dumbbell and exiting his bedroom closing the door behind him.   (Trial Transcript, July 10, 2013, at PageID.756-63).   Once Petitioner exited the bedroom, West telephoned the police.   (Trial Transcript, July 10, 2013, at PageID.764).   West then heard "a crash" which she thought was the TV being knocked over.   (Trial Transcript, July 10, 2013, at PageID.765-66).   West eventually exited Petitioner's bedroom and "freaked out" when she saw "the body and the blood."   (Trial Transcript, July 10, 2013, at PageID.766-68).   West then asked Petitioner, "what the fuck did you do?", to which Petitioner responded, "I didn't do anything.   Do you seriously think I would do something like that." (Trial Transcript, July 10, 2013, at PageID.770).   Petitioner told West that "he just walked out there and had seen Luke on the floor, and all the blood, and the TV was, you know, flipped over, broken, and – and then he – he walked out, saw the scene, dropped the weight, and got on the phone with the police."   (Trial Transcript, July 10, 2013, at PageID.772).   West did not believe

that Petitioner simply dropped the dumbbell without first using it to either defend Rohall or strike Vincent.   (Trial Transcript, July 10, 2013, at PageID.772-73).   West also did not believe that the TV was already overturned when Petitioner exited his bedroom as he alleged.   (Trial Transcript, July 10, 2013, at PageID.773).   West heard the TV get knocked over after Petitioner exited his bedroom with the dumbbell.   (Trial Transcript, July 10, 2013, at PageID.773).

**Christiana Rohall**

Rohall began leasing the residence at 714 West Cedar in October 2011.   (Trial Transcript, July 11, 2013, at PageID.854-55).   Audrie Brown moved in with Rohall in June 2012, with Petitioner moving in the following month.   (Trial Transcript, July 11, 2013, at PageID.856). Luke Vincent moved into the residence in October 2012 at which point Vincent and Rohall began dating.   (Trial Transcript, July 11, 2013, at PageID.859).   Rohall and Vincent "argued" frequently, but with one exception where Vincent "pushed" Rohall, these arguments never turned into physical confrontations.   (Trial Transcript, July 11, 2013, at PageID.859-60).

On October 20, 2012, Rohall and Vincent began drinking "around 4:00 or 5:00 in the afternoon."   (Trial Transcript, July 11, 2013, at PageID.861-62).   The pair later accompanied Vincent's cousin Jake to a local casino where they continued drinking until after 1:00 a.m.   (Trial Transcript, July 11, 2013, at PageID.862).   The trio then returned to Rohall and Vincent's residence.   (Trial Transcript, July 11, 2013, at PageID.862-63).   Because Rohall was drunk, she did not recall the events which resulted in Vincent's fatal injury, but instead remembered only "being at [Vincent's] feet and kneeling down and holding him."   (Trial Transcript, July 11, 2013, at PageID.863-66).   Rohall could not recall if Vincent struck her on the night in question.   (Trial Transcript, July 11, 2013, at PageID.870).

Rohall recalled that she "had a knot on [her] head" that night, but could not recall its cause.  (Trial Transcript, July 11, 2013, at PageID.865-66).   Rohall denied striking Vincent on the night in question.   (Trial Transcript, July 11, 2013, at PageID.867).   When reminded that she had been drunk and was unable to remember all of the night's events, Rohall responded that she was sure she did not strike Luke because she "would never hurt him."   (Trial Transcript, July 11, 2013, at PageID.867).   Rohall did report, however, that there existed "frictions" between Petitioner and Vincent.   (Trial Transcript, July 11, 2013, at PageID.891).

**Tracy Cochran**

As of October 21, 2012, Cochran was employed as a crime lab technician for the Kalamazoo Department of Public Safety.   (Trial Transcript, July 11, 2013, at PageID.899-901).  At approximately 4:00 a.m., Cochran was dispatched to 714 West Cedar to help process the scene of a homicide.  (Trial Transcript, July 11, 2013, at PageID.901-03).   An investigation of the crime scene, including the clothing worn by Luke Vincent, revealed that Vincent was not standing upright or moving around after being injured.  (Trial Transcript, July 11, 2013, at PageID.916-20).   An investigation of the television and surrounding area revealed no evidence that the television had "fallen on" Vincent or otherwise caused his injuries.  (Trial Transcript, July 11, 2013, at PageID.931-32, 941-42).   The size and shape of Vincent's head injuries correlated to the dumbbell recovered in the vicinity of Vincent's body.  (Trial Transcript, July 11, 2013, at PageID.942-48).   A subsequent microscopic examination of this dumbbell revealed the presence of blood.  (Trial Transcript, July 11, 2013, at PageID.922-25).

**David Hayhurst**

Hayhurst testified that he was a forensic scientist employed by the Michigan State Police in one of its Biology and DNA units.  (Trial Transcript, July 11, 2013, at PageID.982).

As part of the investigation into Luke Vincent's death, Hayhurst performed DNA analysis of a sample swabbed from the dumbbell recovered from the vicinity of Vincent's body on the night in question.   (Trial Transcript, July 11, 2013, at PageID.985-98).   This analysis revealed the presence of DNA from "at least three individuals."   (Trial Transcript, July 11, 2013, at PageID.998).   Petitioner's DNA, however, was the most prevalent.   (Trial Transcript, July 11, 2013, at PageID.998-1005).   DNA analysis of blood recovered from the dumbbell revealed the blood to be from Luke Vincent.   (Trial Transcript, July 11, 2013, at PageID.1005-09).

**Sheila Goodell**

As of October 21, 2012, Goodell served as a detective with the Kalamazoo Department of Public Safety.   (Trial Transcript, July 12, 2013, at PageID.1048).   As part of the investigation in Luke Vincent's death, Goodell interviewed Petitioner.   (Trial Transcript, July 12, 2013, at PageID.1048-49).   Petitioner stated that on the night in question, Christiana Rohall "was asking to borrow his cellphone repeatedly because she had lost hers, and that Mr. Vincent would not let her use his."   (Trial Transcript, July 12, 2013, at PageID.1053-54).   Petitioner stated that he was "frustrated" with "the arguing going on in the apartment."   (Trial Transcript, July 12, 2013, at PageID.1055-56).   Petitioner reported that Vincent and Rohall were "constantly fighting."   (Trial Transcript, July 12, 2013, at PageID.1062).

Petitioner reported that Rohall and Luke Vincent later began arguing during which he heard a "loud crash."   (Trial Transcript, July 12, 2013, at PageID.1056).   Petitioner stated that he then exited his bedroom to "see what was going on" and observed Vincent "on top of" Rohall.   (Trial Transcript, July 12, 2013, at PageID.1056).   Petitioner heard Rohall state to Vincent, "you just hit me."   (Trial Transcript, July 12, 2013, at PageID.1056).   Petitioner stated that "there was blood everywhere."   (Trial Transcript, July 12, 2013, at PageID.1057).

12

According to Petitioner, Rohall stated that Vincent had been injured by the television which was laying on the floor.   (Trial Transcript, July 12, 2013, at PageID.1056-57).   Goodell concluded that this explanation "did not make sense" because according to Petitioner, Vincent was on top of Rohall when he walked into the living room.   (Trial Transcript, July 12, 2013, at PageID.1057).   Goodell also questioned Petitioner's explanation because Petitioner indicated that the television "was pretty heavy" and he was unsure of Rohall "would be capable of lifting it."   (Trial Transcript, July 12, 2013, at PageID.1057).   Petitioner denied exiting his bedroom on the night in question carrying a dumbbell.   (Trial Transcript, July 12, 2013, at PageID.1066-67).   Petitioner also denied killing Vincent.   (Trial Transcript, July 12, 2013, at PageID.1081).

**Audrie Brown**

As of October 21, 2012, Brown resided with Christiana Rohall and Petitioner. (Trial Transcript, July 12, 2013, at PageID.1096-97).   The rent for the residence was supposed to be split evenly among the trio, but Petitioner was not paying his share of the rent having apparently arrived at a separate arrangement with the landlord.   (Trial Transcript, July 12, 2013, at PageID.1097-1100).   According to Brown, Rohall and Luke Vincent engaged in "a lot of arguing" and Vincent "often" verbally abused Rohall.   (Trial Transcript, July 12, 2013, at PageID.1100-01, 1107).   While Brown observed that Rohall "frequently" had bruises on her body, she never witnessed Vincent physically strike Rohall.   (Trial Transcript, July 12, 2013, at PageID.1100-01, 1107).   Vincent, however, was known to strike objects such as walls and doors. (Trial Transcript, July 12, 2013, at PageID.1107).   Petitioner owned two dumbbells, but always kept them in his bedroom.   (Trial Transcript, July 12, 2013, at PageID.1108-09).   Brown never saw Petitioner's dumbbells in the living room.   (Trial Transcript, July 12, 2013, at PageID.1109). On the night of Vincent's killing, Brown fell asleep shortly after midnight and did not awake until

after the altercation which resulted in Vincent's death.   (Trial Transcript, July 12, 2013, at PageID.1101-03).

Following the presentation of evidence, the jury found Petitioner guilty of Second Degree Murder.   (Trial Transcript, July 16, 2013, at PageID.1190-92).   Petitioner was sentenced as an habitual offender to serve 20-50 years in prison.   (Sentencing Transcript, August 12, 2013, at PageID.1215).   Petitioner subsequently appealed his conviction in the Michigan Court of Appeals.   The following claims were asserted by Petitioner's counsel:

I.    Defendant-Appellant Brian Peterson was denied his right to a fair trial and due process of law by admission of the irrelevant and highly prejudicial comments by the interrogating police officer.   In the alternative, Mr. Peterson was denied his right to effective assistance of counsel by trial counsel's failure to object.

II.   Where the evidence of first-degree murder was insufficient, Mr. Peterson is entitled to a new trial where the jury was allowed to consider this charge in violation of due process, which substantially decreased Mr. Peterson's chances of acquittal.   In the alternative, Mr. Peterson was denied his right to effective assistance of counsel by trial attorney's failure to move for a directed verdict on first degree murder.

III.  Defendant-Appellant Brian Peterson was denied his right to a fair trial and due process of law by admission of highly graphic photographs of the decedent's bloody body and exposed skull where the danger of unfair prejudice substantially outweighed any probative value.   In the alternative, he Peterson was denied his right to effective assistance of counsel by trial attorney's failure to object.

Petitioner thereafter submitted a pro per supplement in which he asserted the following additional issues:

IV.   Should Defendant-Appellant's conviction be reversed due to police misconduct?

V.    Should Defendant-Appellant's conviction be reversed due to prosecutorial misconduct?

VI.   Was there an improper dismissal of sworn in and deliberating juror by trial judge?

VII.  Were there inconsistent statements by prosecution's key witness?

VIII. Was the conviction against the great weight of the evidence?

IX.      Was there insufficient evidence?

X.       Did the jury not follow the court room jury instructions?

XI.      Was there a conflict of interest?

XII.     Was there ineffective assistance of counsel?


The Michigan Court of Appeals affirmed Petitioner's conviction.    *People v. Peterson*, 2015 WL 3448701 (Mich. Ct. App., May 28, 2015).   Raising the same issues, Petitioner appealed the matter to the Michigan Supreme Court which likewise affirmed his conviction. *People v. Peterson*, 872 N.W.2d 468 (Mich. 2015).   Petitioner subsequently moved in the trial court for relief from judgment, asserting several claims of prosecutorial misconduct and ineffective assistance of counsel.   The trial court denied Petitioner's motion.   *People v. Peterson*, File No. 2012-1591-FC, Order (9th Judicial Cir., Nov. 3, 2016).   Petitioner did not appeal this determination to the Michigan Court of Appeals.   On August 12, 2016, Petitioner initiated the present action asserting the following claims:

I.       Petitioner was denied his right to a fair trial and due process of law by admission of the irrelevant and highly prejudicial comments by the interrogating police officer.   In the alternative, Petitioner was denied his right to effective assistance of counsel by trial counsel's failure to object.

II.      Petitioner was denied his right to effective assistance of counsel by his trial attorney's failure to move for a directed verdict of acquittal on the charge of first degree murder.

III.     Petitioner was denied his right to a fair trial and due process of law by admission of highly graphic photographs of the decedent's bloody body and exposed skull where the danger of unfair prejudice substantially outweighed any probative value.   In the alternative, Petitioner was denied his right to effective assistance of counsel by his attorney's failure to object to these photographs.

IV.      Petitioner was denied his Sixth Amendment right to effective assistance of counsel, as guaranteed by both state and federal constitutions.

15

## STANDARD OF REVIEW

Peterson's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.  The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

>  (d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  *Bell v. Cone*, 535 U.S. 685, 693 (2002).  As the Supreme Court recently emphasized, this standard is "intentionally difficult to meet."  *Woods v. Donald*, 135 S.Ct. 1372, 1376 (2015) (internal quotation omitted).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result."  *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly

incorrect that it would not be debatable among reasonable jurists."  *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999).   The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court.  *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Williams,* 529 U.S. at 411.   Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable.  *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12.   Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context."  *Ayers*, 623 F.3d at 307. Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary."  *Ayers*, 623 F.3d at 308.   Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be

overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding."   While this standard is "demanding" it is "not insatiable."   *Id.* For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly established federal law "as set forth by the Supreme Court at the time the state court rendered its decision." *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007).   This definition of "clearly established federal law" includes "only the holdings of the Supreme Court, rather than its dicta."   *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).   Nevertheless, "the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue."   *Stewart*, 503 F.3d at 493.

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the requirements of either § 2254(d)(1) or § 2254(d)(2).   This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"   *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011).   Instead, when a federal claim has been presented to a state court and the state court has denied relief, "it may be presumed that the state court adjudicated the claim on the merits."   *Id.* at 784-85.   Where such is the case, the Court must apply the deferential standard of review articulated above, rather than some other less deferential standard.

The presumption that the state court "adjudicated [a] claim on the merits" may be overcome only "when there is reason to think some other explanation for the state court's decision is more likely."   *Id.*   If this presumption is overcome, however, the Court reviews the matter de novo.   *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where

state courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

I.          **Procedural Default**

Under the procedural default doctrine, federal habeas review is barred where a state court declined to address a petitioner's claims because of a failure to satisfy state procedural requirements.  *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).  Where a petitioner's claims have been procedurally defaulted, the state court judgment rests on an independent and adequate state ground precluding review by a federal court.  *See Coleman*, 501 U.S. at 750-51; *Wainwright v. Sykes*, 433 U.S. 72, 81 (1977); *Harris v. Reed*, 489 U.S. 255, 262 (1989).  If a claim has been procedurally defaulted, federal habeas review is available only if the petitioner can establish either (1) the existence of cause for his default and actual prejudice resulting therefrom, or (2) that the failure to consider the merits of the claim will result in a fundamental miscarriage of justice.  *See Williams v. Bagley*, 380 F.3d 932, 966 (6th Cir. 2004) (citing *Coleman*, 501 U.S. at 750).

Respondent argues that Petitioner has procedurally defaulted many of the claims presented in this matter.  The Court, however, is not obligated to address Respondent's procedural default argument and can instead simply decide Peterson's petition on the merits.  *See, e.g., Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (recognizing that "judicial economy" may justify addressing a habeas petition on the merits rather than addressing complicated procedural default questions).  With respect to certain issues asserted by Petitioner on direct appeal, the

19

Michigan Court of Appeals determined that such had been defaulted by Petitioner's failure to properly assert the issue in question in the trial court. *People v. Peterson*, 2015 WL 3448701 at *1-5 (Mich. Ct. App., May 28, 2015). The court nevertheless addressed the issues for "plain error." *Ibid.* As the Sixth Circuit has recently made clear, state court review of a claim for "plain error" constitutes an adjudication on the merits to which AEDPA deference is accorded. *See Stewart v. Trierweiler*, 867 F.3d 633, 638 (6th Cir. 2017); *Bacall v. Stoddard*, 716 Fed. Appx. 502, 507 (6th Cir., Nov. 29, 2017); *Dixon v. Burt*, 2018 WL 2016252 at *2 (6th Cir., Apr. 30, 2018). The Court, therefore, opts to simply address Petitioner's claims on the merits. *See, e.g., McLemore v. Bell*, 503 Fed. Appx. 398, 404 (6th Cir., Oct. 31, 2012) (observing that when facing "the analytical morass in which procedural-default rules ensnare us," "[a]n analysis of the merits of the petitioner's substantive claims presents a more straightforward ground for decision"). The Court finds that Respondent is not prejudiced by such because even addressed on the merits, Petitioner's claims do not entitle him to relief.

## II.        Evidentiary Claims

As noted above, Detective Sheila Goodell interviewed Petitioner regarding the events leading to Luke Vincent's death. Petitioner argues that his right to a fair trial was violated by certain aspects of Goodell's testimony. Specifically, Plaintiff argues that Goodell offered improper opinion testimony as to his veracity. Each of Petitioner's specific claims is examined below.

Errors by a state court on matters involving the admission or exclusion of evidence are not generally cognizable in a federal habeas proceeding. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). To obtain relief, Petitioner cannot simply argue that the trial court's

evidentiary ruling was incorrect, as "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991); *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) ("[w]e have stated many times that federal habeas corpus relief does not lie for errors of state law").  Rather, Petitioner must establish that his conviction violated the Constitution, laws, or treaties of the United States.  *Estelle*, 502 U.S. at 67.

In this respect, it is recognized that "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief."  *Bugh*, 329 F.3d at 512; *see also*, *Norris v. Schotten*, 146 F.3d 314, 328-29 (6th Cir. 1998) (citing *Estelle*, 502 U.S. at 67-68).   Fundamental fairness does not, however, "require a perfect trial," *Clemmons*, 34 F.3d at 358, and courts have defined those violations which violate fundamental fairness "very narrowly."  *Bugh*, 329 F.3d at 512.   State court evidentiary rulings do not offend due process unless they violate "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."  *Ibid.* (citations omitted).

A.    Petitioner's Explanation Did Not Make Sense

As noted above, Detective Goodell testified that Petitioner's explanation for how Vincent was injured "did not make any sense."   (Trial Transcript, July 12, 2013, at PageID.1057). However, Detective Goodall did not offer an opinion as to whether Petitioner was lying.   Instead, as Goodall testified "the way [Petitioner] described [the events causing Vincent's death] did not make any sense, so I asked him some additional questions."   (Trial Transcript, July 12, 2013, at PageID.1057).   The testimony in question did not constitute an improper opinion as to Petitioner's veracity, but was instead simply an explanation for why Goodell conducted her interview with Petitioner in the manner she did.

21

The Michigan Court of Appeals rejected this claim, observing that "Goodell was explaining the steps she took in the interview and the jury was clearly informed of this fact." *People v. Peterson*, 2015 WL 3448701 at *1-2 (Mich. Ct. App., May 28, 2015).   This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law.   Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, this claim raises no issue upon which habeas relief may be granted.

B.      Petitioner Never Identified Who He Thought Did It

During Petitioner's trial, the court permitted the jurors to ask questions of the witnesses.   (Trial Transcript, July 12, 2013, at PageID.1067-76).   In the context of reading to Detective Goodell one of the jury's questions, the following exchange occurred between the trial judge and Goodell:

The Court:     Did Brian Peterson say he did not do it when you interviewed him?

Goodell:       Yes, he did say that.   He said he did not do it.

The Court:     Did he say who he thought did?

Goodell:       No.   He – that was the problem, is he denied doing it himself, but he never offered up who he thought did it.

(Trial Transcript, July 12, 2013, at PageID.1079).

Again, Detective Goodell did not offer any opinion concerning Petitioner's veracity.   As for why Goodell perceived Petitioner's failure to identify "who he thought did it" as a problem, one can only speculate because Goodell was not asked to elaborate on such.   The Michigan Court of Appeals rejected this claim.   *People v. Peterson*, 2015 WL 3448701 at *1-2

22

(Mich. Ct. App., May 28, 2015).   This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law.   Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

C.    Goodall Described Petitioner's Demeanor as Defensive

One of the jury's questions to Detective Goodell asked her to describe Petitioner's "demeanor during [her] interview," to which Goodell testified, "defensive."   (Trial Transcript, July 12, 2013, at PageID.1088).   This testimony does not constitute an opinion as to Petitioner's veracity.   The Michigan Court of Appeals rejected this claim.   *People v. Peterson*, 2015 WL 3448701 at *1-2 (Mich. Ct. App., May 28, 2015).   This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law.   Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, this claim raises no issue upon which habeas relief may be granted.

D.    Goodall Told Petitioner He Was Lying

Following Detective Goodell's testimony that Petitioner appeared "defensive," Petitioner's counsel asked Goodell if she told Petitioner "that he was lying," to which Goodell responded, "in so many words, yes."   (Trial Transcript, July 12, 2013, at PageID.1089).   This exchange does not entitle Petitioner to relief for at least two reasons.

First, Goodell did not testify that she believed Petitioner to be untruthful.   Instead, she testified that she insinuated to Petitioner that he was being less than truthful.   While it is not necessarily unreasonable to conclude that Goodell made this comment because she believed it to be accurate, it must also be remembered that being untruthful with interview subjects is a lawful

23

and accepted law enforcement interviewing tactic.   Whether Goodell's testimony reflects an opinion that Petitioner is a liar or was instead a false statement employed as an interview tactic is not clear from the record because the matter was not explored further.   While it may be the case that Goodell considered Petitioner to be a liar, she did not testify that such was the case. Petitioner is not entitled to habeas relief based upon speculation as to the meaning of the brief exchange in question.   Second, Petitioner has failed to identify, and the Court has not located, authority that a petitioner's right to a fair trial is violated when the petitioner directly and purposely elicited testimony which the petitioner asserts calls into question his veracity.[1]

The Michigan Court of Appeals rejected this claim.   *People v. Peterson*, 2015 WL 3448701 at *1-2 (Mich. Ct. App., May 28, 2015).   This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law.   Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, this claim raises no issue upon which habeas relief may be granted.

III.        **Introduction of Photographs**

Numerous photographs were entered into evidence during Petitioner's trial.   Some of these photographs were taken at the crime scene and depicted Luke Vincent's body.   (Trial Transcript, July 10, 2013, at PageID.560-61; Trial Transcript, July 11, 2013, at PageID.899-954). Other photographs were taken during Vincent's autopsy.   (Trial Transcript, July 10, 2013, at PageID.683-84, 685-703; Trial Transcript, July 11, 2013, at PageID.942-43, 946-47).   Many of these autopsy photographs depicted images of Vincent's head taken from various angles and

---

1 While such questioning might arguably constitute ineffective assistance of counsel, as discussed below, Petitioner's counsel asked Goodell the question at issue for a reasonable strategic reason.

24

vantage points.  (Trial Transcript, July 10, 2013, at PageID.694-703; Trial Transcript, July 11, 2013, at PageID.946-47).

Petitioner argues that the introduction of these photographs deprived him of the right to a fair trial.  Petitioner argues that these photographs were gruesome, cumulative to other evidence, and were not relevant to any disputed issue.   As noted above, to obtain relief on a claim that the state court erred by admitting the photographs in question, Petitioner cannot simply argue that the trial court's evidentiary ruling was incorrect.   Instead, Petitioner must establish that the admission of the challenged photographs denied him of the right to a fair trial.

Because Petitioner has failed to submit the photographs (or copies thereof) for consideration, the Court can only speculate as to the nature of the challenged photographs.   It must be noted, however, that habeas relief cannot be granted on the basis of speculation and unsubstantiated assertions.   With respect to the general issue raised by Petitioner's claim, courts recognize that admission of photographs which depict a murder victim or taken during an autopsy, when relevant to an issue at trial, do not deprive a criminal defendant of a fair trial.  *See, e.g., Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2005); *Franklin v. Bradshaw*, 695 F.3d 439, 456-57 (6th Cir. 2012); *Johnson v. Westbrooks*, 2017 WL 6398034 at *2 (6th Cir., July 21, 2017); *Meridy v. Ludwick*, 2018 WL 4191337 at *1 (6th Cir., May 21, 2018).   In rejecting this claim, the Michigan Court of Appeals concluded:

> Photographic evidence is generally admissible as long as it is relevant, and not unduly prejudicial. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."
>
> When a defendant pleads not guilty, all elements of the offense are at issue, and the prosecution must prove each element beyond a

25

reasonable doubt. At issue in the present case was, among other things, defendant's intent. The autopsy pictures were essential to proving defendant's intent. The fact that Vincent had three injuries to his head, including a depressed skull fracture, made it more probable that the acts of whoever struck Vincent were done with the intent to kill or cause great bodily harm. Additionally, the pictures were relevant because they assisted the jury in determining the credibility of Dr. Michael Markey, the forensic pathologist who performed the autopsy on Vincent and testified about his injuries.

Replicas of two autopsy pictures were also admitted during the testimony of Tracy Cochran, a crime laboratory technician. Cochran testified that the length of the injury to the right side of Vincent's head was 2–1/2 inches long and that the angles in tears to the skin on the right side and back of Vincent's head were 123 and 125 degrees. The two replicas were relevant because they showed where the measurements were taken and assisted the jury in determining whether the dumbbell was the murder weapon and assessing Cochran's credibility. Rather than depending solely on the testimony of Cochran regarding the measurements, the jury was entitled to view where the measurements were taken.

Photographs may be used to explain and corroborate the testimony of witnesses. The crime scene pictures explained and corroborated witness testimony, such as testimony from Officer Brian Veltman and Sergeant Scott Miller that a television was on the ground near the television stand, there was five feet between Vincent and the television, and there was a dumbbell near Vincent. In addition, the pictures, which depicted pools of blood, explained and corroborated Cochran's testimony that there was a slope to the floor, blood ran from Vincent to the television, and there was no evidence that the television fell on Vincent. The pictures, which enabled the jury to see the crime scene, rather than having to rely solely on the testimony of witnesses, were relevant because they had a tendency to make a fact of consequence, i.e., whether Vincent was struck with a dumbbell, more probable.

It is true that several of the challenged pictures are gruesome. However, gruesomeness does not necessarily require exclusion of relevant pictures under MRE 403. "The proper inquiry is always whether the probative value of the photographs is substantially outweighed by the danger of unfair prejudice." Here, the danger of unfair prejudice did not substantially outweigh the high probative value of the autopsy and crime scene pictures.

26

*People v. Peterson*, 2015 WL 3448701 at *4-5 (Mich. Ct. App., May 28, 2015).

This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law.   Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, this claim raises no issue upon which habeas relief may be granted.

**IV.          Ineffective Assistance of Counsel**

Petitioner asserts that he is entitled to relief on the ground that he was denied the right to the effective assistance of trial counsel.   Specifically, Petitioner argues that his trial counsel's performance was deficient in the following ways: (1) by failing to object to the allegedly improper testimony by Detective Goodell discussed above; (2) by failure to object to the admission of the challenged photographs discussed above; (3) by failing to move for a directed verdict of acquittal on the charge of First Degree Murder; (4) by failing to obtain a recording of Detective Goodell's interview of Petitioner; (5) by failing to cross-examine Lindsey West "about when she last paid counsel and about Goodell's threat that she could be charged with perjury and face life in prison"; and (6) for failing to allow Petitioner to listen "to the 911 call" prior to trial.

To establish ineffective assistance of counsel, Petitioner must show both deficient performance by his counsel and prejudice resulting therefrom.   *See Premo v. Moore*, 562 U.S. 115, 121 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)).   To establish deficient performance, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness."   *Premo*, 562 U.S. at 121 (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).   A court considering a claim of ineffective assistance must apply a "strong presumption that counsel's representation was within the 'wide range' of reasonable professional

assistance." *Premo*, 562 U.S. at 121 (quoting *Strickland*, 466 U.S. at 689).   Petitioner's burden is to show that "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Premo*, 562 U.S. at 121-22 (quoting *Strickland*, 466 U.S. at 687).

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance.   Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Premo*, 562 U.S. at 122 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)); *see also*, *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008).   In the context of a sentencing proceeding, Petitioner must demonstrate that there exists a reasonable probability that, but for counsel's errors, he would have received a more favorable sentence. *See, e.g., Stumpf v. Robinson*, 722 F.3d 739, 753-54 (6th Cir. 2013) (to prevail on a claim that counsel rendered ineffective assistance at sentencing, petitioner must demonstrate that there exists a reasonable probability that absent counsel's errors he would have received a different sentence).

The issue is whether counsel's representation "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Premo*, 562 U.S. at 122 (quoting *Strickland*, 466 U.S. at 690).   This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

As the Supreme Court has made clear, even when reviewing an ineffective assistance of counsel claim *de novo*, "the standard for judging counsel's representation is a most

deferential one." *Premo*, 562 U.S. at 122.   Likewise, the standard by which petitions for habeas relief are judged is "highly deferential."   Thus, when reviewing, in the context of a habeas petition, whether a state court unreasonably applied the *Strickland* standard, review is "doubly deferential.   *Id.* (citations omitted).   As the *Premo* Court concluded:

> The *Strickland* standard is a general one, so the range of reasonable applications is substantial.   Federal habeas courts must guard against the danger of equating reasonableness under *Strickland* with unreasonableness under § 2254(d).   When § 2254(d) applies, the question is not whether counsel's actions were reasonable.   The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* at 122-23 (internal citations omitted).

A.    Detective Goodell's Testimony

As discussed above, Petitioner challenged several aspects of Goodell's testimony. With respect to the testimony elicited by the prosecutor and the court, because the challenged testimony was not inadmissible it would have been futile for counsel to object.   Failure to assert futile objections cannot constitute ineffective assistance of counsel.   *See, e.g., Kelly v. McKee*, 2017 WL 2831019 at *6 (6th Cir., Jan. 24, 2017).   The Michigan Court of Appeals rejected these claims for this reason.   *People v. Peterson*, 2015 WL 3448701 at *1-2 (Mich. Ct. App., May 28, 2015).

With respect to Goodell's testimony that she insinuated to Petitioner that he was lying, the Michigan Court of Appeals determined that this line of questioning by Petitioner constituted reasonable trial strategy.   As the court observed:

> defense counsel was not ineffective for asking Goodell whether she told defendant that he was lying. Counsel asked the question almost immediately after Goodell testified that defendant was defensive in the interview. There was a strategic reason for the question. By

29

> eliciting Goodell's testimony that she told defendant he was lying, counsel gave the jury a nonincriminating explanation for defendant's defensive demeanor. Defendant has failed to overcome the presumption that counsel's questioning of Goodell was sound trial strategy.

*People v. Peterson*, 2015 WL 3448701 at *1-2 (Mich. Ct. App., May 28, 2015).

These determinations are neither contrary to, nor involve an unreasonable application of, clearly established federal law.   Furthermore, these decisions were not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, these claims raise no issue upon which habeas relief may be granted.

B.    Photographs

Petitioner argues that his attorney rendered ineffective assistance by failing to object to the admission of the challenged photographic evidence discussed above.   Because the photographs in question were not inadmissible, it would have been futile for counsel to object to their admission.   The Michigan Court of Appeals rejected this claim on this basis.   *People v. Peterson*, 2015 WL 3448701 at *1-2 (Mich. Ct. App., May 28, 2015).   This conclusion is neither contrary to, nor involve an unreasonable application of, clearly established federal law. Furthermore, this conclusion was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, this claim raises no issue upon which habeas relief may be granted.

C.    First Degree Murder Charge

Petitioner was charged with open murder which, under Michigan law, contemplates conviction of either First Degree Murder or Second Degree Murder.   *See, e.g., People v. Watkins*, 634 N.W.2d 370, 376 (Mich. Ct. App. 2001).   Petitioner faults his attorney for failing to move

for a directed verdict of acquittal on the charge of First Degree Murder. However, because Petitioner was acquitted by the jury of First Degree Murder, Petitioner cannot establish that he was prejudiced by counsel's actions.   Accordingly, the rejection of this claim by the Michigan Court of Appeals, *People v. Peterson*, 2015 WL 3448701 at *3-4 (Mich. Ct. App., May 28, 2015), is neither contrary to, nor involve an unreasonable application of, clearly established federal law. Furthermore, this conclusion was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, this claim raises no issue upon which habeas relief may be granted.

### D.       Failing to Obtain Recording of Detective Goodell's Interview

In response to questioning by Petitioner's counsel, Detective Goodell testified that she did not threaten Petitioner with prosecution "if he didn't confess."   (Trial Transcript, July 12, 2013, at PageID.1089).   Petitioner argues that his attorney was ineffective for failing to obtain a recording of his interview with Detective Goodell.   Petitioner argues that a recording of this interview would reveal that Detective Goodell did, in fact, threaten to prosecute him if he did not confess to killing Luke Vincent.

Petitioner has presented no evidence that a recording of this interview exists or that any recording of such would reveal that Goodell made any comments that are contrary to the aforementioned testimony.   Thus, Petitioner cannot demonstrate that he was prejudiced by his attorney's allegedly deficient performance.   Noting that Petitioner "has not established the factual predicate[] for [this] claim[]," the Michigan Court of Appeals rejected this claim.   *People v. Peterson*, 2015 WL 3448701 at *9 (Mich. Ct. App., May 28, 2015).   This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law.

Furthermore, this determination was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, this claim raises no issue upon which habeas relief may be granted.

### E.    Failure to Cross-Examine Lindsey West

Petitioner next faults his attorney for failing to cross-examine Lindsey West "about when she last paid counsel and about Goodell's threat that she could be charged with perjury and face life in prison."   Petitioner has failed to present evidence that questioning West about these matters would have produced evidence favorable to his defense.   Thus, Petitioner cannot demonstrate that he was prejudiced by his attorney's allegedly deficient performance.   Noting that Petitioner "has not established the factual predicate[] for [this] claim[]," the Michigan Court of Appeals rejected this claim.   *People v. Peterson*, 2015 WL 3448701 at *9 (Mich. Ct. App., May 28, 2015).   This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law.   Furthermore, this determination was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, this claim raises no issue upon which habeas relief may be granted.

### F.    911 Call

Finally, Petitioner faults his attorney for failing to allow him to listen "to the 911 call" prior to his trial.   Petitioner has failed to present evidence or argument that this failure prejudiced his defense.   Noting that Petitioner "has not established the factual predicate[] for [this] claim[]," the Michigan Court of Appeals rejected this claim.   *People v. Peterson*, 2015 WL 3448701 at *9 (Mich. Ct. App., May 28, 2015).   This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law.   Furthermore, this

determination was not based on an unreasonable determination of the facts in light of the evidence presented.   Accordingly, this claim raises no issue upon which habeas relief may be granted.

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Peterson's petition for writ of habeas corpus be **denied**.   The undersigned further recommends that a certificate of appealability be denied.   *See Slack v. McDaniel*, 529 U.S. 473 (2000); *Miller-El*, 537 U.S. at 336.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice.   28 U.S.C. § 636(b)(1)(C).   Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date: October 17, 2018                                   /s/ Ellen S. Carmody
                                                         ELLEN S. CARMODY
                                                         United States Magistrate Judge